Filed 9/5/25  P. v. Hernandez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CRUZ HERNANDEZ,<br><br>    Defendant and Appellant. | E083949<br><br>(Super.Ct.No. FSB900528)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Harold T. Wilson, Jr., Judge.  Affirmed.

Stephanie L. Gunther, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Monique Myers, Deputy Attorneys General, for Plaintiff and Respondent.

Edin Cruz Hernandez was born in Mexico and entered the United States in 2003, when he was 20 years old. In 2009, Hernandez pled guilty to assault by means of force likely to cause great bodily injury. (Former Pen. Code, § 245, subd. (a)(1) (§ 245(a)(1)); unlabeled statutory references are to this code.) In 2023, Hernandez moved under section 1473.7, subdivision (a)(1) (§ 1473.7(a)(1)), to vacate his conviction and withdraw his plea. The trial court denied the motion, and Hernandez appealed. We affirm.

BACKGROUND

In January 2009, Hernandez was arrested on a charge of assault with a deadly weapon (§ 245(a)(1)) after an incident involving several security guards at a nightclub, where Hernandez had been dancing with his then-girlfriend, Maria Z. Police were dispatched to the scene and took statements from Maria, the alleged victim (Hector M.), and two security guards (Uriel O. and Thomas D.). Hernandez was advised of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 and declined to give a statement.

Thomas said that Hernandez became aggressive when Thomas approached Maria and told her that she had to wear her shoes inside the club. Thomas and Uriel said that they escorted Maria and Hernandez out of the club. Uriel followed the couple to the parking lot to ensure that they left the area.

In the club's parking lot, Uriel saw Maria and another man get Hernandez into the back seat of a vehicle. But Hernandez crawled into the driver's seat, and Maria then tried but failed to pull Hernandez out of the car. Hernandez started the engine and rapidly accelerated toward Hector, a parking lot security guard or attendant. Hector said that he

2

was standing in the middle of the driveway near Hernandez's car when it headed directly toward him. According to both Hector and Uriel, Hector jumped onto the flatbed of a truck to avoid being struck by Hernandez's car. Security guards pepper-sprayed Hernandez and detained him until police arrived and arrested him.

Maria gave the following account of what happened: After she and Hernandez voluntarily left the club, security guards followed them into the parking lot and teased them with their batons. Hernandez got into the driver's seat of the car and started it, but one of the security guards blocked Hernandez's exit by standing in front of the car. A friend pulled Hernandez out of the car in order to calm him down, and security guards then surrounded Hernandez and pepper-sprayed him "for no reason."

Hernandez was charged with one felony count of assault with a deadly weapon— to wit, a motor vehicle, in violation of section 245(a)(1). Assault with a deadly weapon is a strike offense under the three strikes law. (See §§ 667, subd. (a)(1), 1192.7, subd. (c).)

In December 2009, Hernandez pled guilty to assault by means of force likely to cause great bodily injury in violation of former section 245(a)(1).[1] The plea form states that Hernandez was pleading guilty to a "non-strike." On that form, Hernandez initialed the box acknowledging the following statement: "I understand that if I am not a citizen of the United States, deportation, exclusion from admission to the United States, or denial of naturalization will result from a conviction of the offense(s) to which I plead

---

[1] In 2012, the Legislature amended section 245 and separated assault by means of force likely to produce great bodily injury into a distinct subdivision, (a)(4). (Assem. Bill No. 1026 (2011-2012 Reg. Sess.) § 1.)

guilty/nolo contendere (no contest)." He also initialed a box acknowledging that his lawyer explained everything in the declaration to him.

Soon after entering the guilty plea, Hernandez gave an account of the incident to a probation officer for the presentence report. Hernandez denied that he committed the offense, and he "maintained that he never attempted to run over the security guards because he was not behind the wheel." Hernandez reported that a security guard "aggressively grabbed [his girlfriend's] arm and led her off the dance floor," at which point he "became upset and challenged the security guard to fight." Hernandez became nervous and asked "his girlfriend" to drive them home, but "[b]efore he could get in the car, several security guards beat him up and . . . sprayed him with pepper spray." The probation officer reported that Hernandez believed that "the plea agreement is fair."

The probation report identified Maria as Hernandez's fiancée. The probation officer documented that Hernandez did not have any children and that his mother lived in Mexico. Hernandez's father is listed as deceased. Hernandez had been working for a contractor for eight months as a general laborer.

The trial court sentenced Hernandez to the agreed-upon term of 180 days in county jail, which could be served by work release or on the weekend, and three years of probation. One of the conditions of probation required that Hernandez not remain in the country "without proper written authorization by the Department of Homeland Security—Bureau of Citizenship and Immigration Services."

In 2017, the trial court reduced the felony assault conviction to a misdemeanor and granted Hernandez's petition to dismiss the conviction under section 1203.4.

That same year, Hernandez filed a petition "with the United States Customs and Immigration" to become a lawful permanent resident. Hernandez was subsequently told that he needed to leave the United States and appear for an interview in Mexico for the petition to be considered. In 2022, Hernandez left the United States to attend a scheduled interview in Mexico. During the interview, he was told that he did not qualify for a visa to reenter the United States because of the assault conviction.

In 2023, Hernandez filed a motion to vacate the assault conviction under section 1473.7(a)(1). He argued that he did not understand the immigration consequences of his guilty plea because his defense counsel misadvised him that "it would be better if [Hernandez] accepted the deal so that 'it does not get [him] deported.'" Hernandez's counsel passed away before Hernandez filed the motion.

Hernandez submitted a signed declaration in support of the motion. He stated that he was born in Mexico and came to the United States in 2003, when he was 20 years old. In 2005, he began a romantic relationship with Maria (his girlfriend during the nightclub incident), and they started living together. Maria is a citizen of the United States. Hernandez and Maria married in 2016.

With respect to the assault conviction, Hernandez asserted that he would have rejected the plea bargain and gone to trial if he had known the resulting conviction would prevent him from obtaining a visa to reenter the United States. He stated that he had

5

acted in self-defense in the underlying incident. He asserted that he repeatedly told numerous attorneys from the public defender's office who represented him during the criminal proceeding that he acted in self-defense and "wanted to fight the case." Hernandez described the incident as follows: After arguing with a security guard in the nightclub who "placed his hands on Maria," Hernandez and Maria voluntarily left the club. The security guard then "followed [them] outside, and approached [Hernandez] with a baton. A physical altercation ensued between myself and the security guard. As a result of the physical altercation, I had to defend myself. I acted in self-defense."

The People filed written opposition to Hernandez's motion to vacate the conviction. The People argued that when Hernandez entered his guilty plea in 2009 "a violation of section 245 effectively carried no negative immigration consequences," because it was not then considered a crime of moral turpitude and not considered an aggravated felony unless he was sentenced to over one year in prison.

At the hearing on the motion, both parties submitted on their written filings. The court denied the motion, reasoning: "I think this issue boils down to, quite frankly, to the date of the conviction in this case, which was 2009. The laws were much different then with respect to and the liabilities attached in the immigration consequences and the advisals that were required and the duties of defense counsel to advise their client with respect to immigration consequences and issues. At this point the Court finds there were no violations that the plea was taken."

DISCUSSION

I.     *Section 1473.7*

Hernandez argues that the trial court prejudicially erred by denying his motion to vacate the assault conviction.  We find no prejudicial error.

Section 1473.7(a)(1) provides that "[a] person who is no longer in criminal custody may file a motion to vacate a conviction" if the conviction is "legally invalid due to prejudicial error damaging the moving party's ability to meaningfully understand, defend against, or knowingly accept the actual or potential adverse immigration consequences of a conviction or sentence."

To prevail, the moving party must show three things.  (§ 1473.7, subds. (a)(1), (e)(1).)  First, they must show that they did not meaningfully understand the immigration consequences of their plea.  (*People v. Espinoza* (2023) 14 Cal.5th 311, 319 (*Espinoza*).)  Second, they must show that their "misunderstanding constituted prejudicial error." (*Ibid.*)  And third, they must show that the conviction or sentence being challenged currently is causing "or has the potential to cause removal or the denial of an application for an immigration benefit, lawful status, or naturalization."  (§ 1473.7, subd. (e)(1).) The moving party bears the burden of establishing entitlement to relief by a preponderance of the evidence.  (*Ibid.*)

To show prejudicial error under subdivision (e)(1) of section 1473.7, the moving defendant must demonstrate "a reasonable probability that the defendant would have rejected the plea if the defendant had correctly understood its actual or potential

7

immigration consequences." (*People v. Vivar* (2021) 11 Cal.5th 510, 529 (*Vivar*); *Espinoza*, *supra,* 14 Cal.5th at p. 319.) "Factors particularly relevant to this inquiry include the defendant's ties to the United States, the importance the defendant placed on avoiding deportation, the defendant's priorities in seeking a plea bargain, and whether the defendant had reason to believe an immigration-neutral negotiated disposition was possible." (*Vivar*, at pp. 529-530; *Espinoza*, at p. 320.) "Also relevant are the defendant's probability of obtaining a more favorable outcome if he had rejected the plea, as well as the difference between the bargained-for term and the likely term if he were convicted at trial." (*Espinoza,* at p. 320.)

"A defendant must provide '"objective evidence"' to corroborate factual assertions." (*Espinoza*, *supra*, 14 Cal.5th at p. 321.) "Objective evidence includes facts provided by declarations, contemporaneous documentation of the defendant's immigration concerns or interactions with counsel, and evidence of the charges the defendant faced." (*Ibid*.; *People v. Bravo* (2021) 69 Cal.App.5th 1063, 1074 (*Bravo*).) "However, 'a defendant's self-serving statement—after trial, conviction, and sentence—that with competent advice he or she *would* have accepted [or rejected] a proffered plea bargain, is insufficient in and of itself to sustain the defendant's burden of proof as to prejudice, and must be corroborated independently by objective evidence." (*Bravo*, at p. 1074.)

We independently review whether a movant has demonstrated entitlement to relief under section 1473.7(a)(1). (*Vivar*, *supra*, 11 Cal.5th at p. 524.) In this context,

independent review does not mean de novo review.  (*People v. Coca* (2023) 96 Cal.App.5th 451, 458 (*Coca*).)  "We exercise '"independent judgment to determine whether the facts satisfy the rule of law."'"  (*Ibid.*)  We weigh and consider all relevant circumstances, with no single factor being dispositive.  (*Ibid.*)  We are in the same position as the trial court "'in interpreting written declarations' when reviewing a cold record in a section 1473.7 proceeding."  (*Vivar*, at p. 528.)

Hernandez argues that "the trial court used the wrong legal standard in denying the motion" to vacate under section 1473.7(a)(1).  The People concede the point, and we agree.  The trial court concluded that Hernandez did not misunderstand the immigration consequences of his plea because no such consequences existed when the plea was entered.  (§ 1473.7(a)(1).)  That was error.  In 2020, the Ninth Circuit held that convictions under section 245 for assault with a deadly weapon and assault with force likely to cause great bodily injury are categorically crimes of moral turpitude under the Immigration and Nationality Act (INA) (8 U.S.C. § 1101 et seq.).  (*Safaryan v. Barr* (9th Cir. 2020) 975 F.3d 976, 988.)  A noncitizen who commits a crime of moral turpitude is subject to removal.  (8 U.S.C. § 1227(a)(2)(A)(i); *Coca*, *supra*, 96 Cal.App.5th at p. 458.)  The Ninth Circuit's interpretation of the INA applies retroactively (*Vazquez v. Jan-Pro Franchising Internat., Inc.* (2021) 10 Cal.5th 944, 951), so the trial court erred by concluding that Hernandez did not face adverse immigration consequences when he pled guilty.

9

Reversal is not warranted by error alone.  (*People v. Bunas* (2022) 79 Cal.App.5th 840, 866 (*Bunas*).)  It is the appellant's burden to demonstrate that the error was prejudicial.  (*Ibid.*)  The appellant must demonstrate that it is reasonably probable that the result would have been more favorable absent the error.  (*Ibid.*)  Hernandez has failed to satisfy that requirement, because he cannot demonstrate that it is reasonably probable that the trial court would have granted the motion absent the error.

Assuming for the sake of argument that Hernandez did not meaningfully understand the immigration consequences of his plea, he failed to show that the misunderstanding constituted prejudicial error within the meaning of section 1473.7.  In the declaration submitted in support of the motion, Hernandez stated that he would have rejected the plea and fought the assault with a deadly weapon charge if he had understood the immigration consequences of the plea.  But that self-serving statement alone is not sufficient to carry his burden of proof as to prejudice.  (*Bravo*, *supra*, 69 Cal.App.5th at p. 1074.)  Rather, it "'must be corroborated independently by objective evidence.'" (*Ibid.*)

Hernandez contends that he had significant ties to the community that would have compelled him to reject the plea.  The record does not support that contention.

A defendant's "deep and long-standing ties to the Unites States" may "support an inference that immigration consequences were of paramount concern at the time of the defendant's guilty plea."  (*Espinoza*, *supra*, 14 Cal.5th at p. 323.)  What matters is the strength of the defendant's existing community ties at the time of his plea.  (*Ibid.*)

"Community ties may be established by the [defendant's] length of residence; immigration status; lack of connection to the country of origin; connections to family, friends, or the community; work history or financial ties; or other forms of attachment." (*Id.* at p. 321.)

For example, in *Espinoza*, the defendant moved to the United States when he was 13 years old, became a lawful permanent resident when he was 18 years old, and lived in the United States for over 20 years before his conviction. His immediate family lived in the Unites States, his wife and six children were citizens, and he was the financial provider for his family at the time of his plea. (*Espinoza*, *supra*, 14 Cal.5th at pp. 317, 322.) Similarly, in *Vivar*, the defendant moved to the United States at age six as a lawful resident, and he remained for 40 years. (*Vivar*, *supra*, 11 Cal.5th at p. 530.) When the defendant in *Vivar* pled guilty, "he had two children, two grandchildren, and a wife, all of whom are citizens and all of whom resided in California," and he had "virtually no ties to Mexico." (*Ibid.*) In both cases, the Supreme Court concluded that the "deep and long-standing ties to the United States" supported "an inference that immigration consequences were of paramount concern at the time of the defendant's guilty plea." (*Espinoza*, at p. 323; *Vivar*, at p. 520.)

Hernandez's community ties do not support the same inference. Although the record shows that Hernandez had some ties to the community, those ties were not especially strong. Hernandez entered the United States when he was 20 years old, had been living in the United States for only about six years when he pled guilty, and had not

11

obtained lawful status to remain in the United States. He had been working for eight months as a general laborer for a contractor and lived with his then-girlfriend Maria, who is a United States citizen. They had been in a romantic relationship for approximately four years and may have been engaged to be married, but the record is not clear on that point. The probation officer who authored the presentence probation report in early 2010 identified Maria as Hernandez's fiancée, but Hernandez referred to Maria as his girlfriend in the statement he gave to the probation officer. Regardless of when they became engaged, Hernandez and Maria did not marry until nearly seven years after Hernadez entered his plea. And the couple did not have any children. In addition, Hernandez's only living parent lived in Mexico, and the record contains no evidence that Hernandez had any other known relatives in the United States.

Thus, Hernandez's only ties to the United States were a several-years long romantic relationship that had not yet culminated in marriage and a job that he held for less than one year. Given that Hernandez entered the United States when he was an adult, had only lived in the United States for a relatively short period, had not sought lawful status to remain in the United States, and continued to have immediate family ties in Mexico, his limited community ties were not strong enough to support an inference that he would have rejected the plea offer if he had known of its immigration consequences.

Hernandez also argues that he was prejudiced within the meaning of section 1473.7 because he would have gone to trial and claimed self-defense rather than plead

guilty to an offense that would subject him to adverse immigration consequences.  Again, the only evidence supporting the claim is Hernandez's self-serving statements in his declaration.  Standing alone, that evidence is insufficient to demonstrate prejudice. (*Bravo*, *supra*, 69 Cal.App.5th at p. 1074.)

The contemporaneous evidence shows that Hernandez's priority in entering the plea agreement was to obtain a shorter sentence, not to avoid negative immigration consequences.  Before he was sentenced, Hernandez told a probation officer that he believed that the plea agreement was "fair," even though Hernandez also told the officer that he did not even commit the offense.  Furthermore, the details of the plea deal support Hernandez's assessment of the agreement.  If Hernandez rejected the plea and was convicted of assault with a deadly weapon at trial, he faced up to four years in state prison (former § 245(a)(1)) and a strike conviction (see § 667, subd. (a)(1); § 1192.7, subd. (c)).  Under the plea agreement, the conviction was specifically designated as not a strike and thus did not have the potential future adverse consequences of a strike conviction.  In addition, Hernandez was sentenced to a relatively short jail term, which he was allowed to serve nonconsecutively and on weekends, thus likely disrupting his daily life far less than any prison sentence.

Moreover, Hernandez has not identified evidence that tends to suggest that he had a meritorious defense to the assault charge.  On the contrary, there was strong evidence of Hernandez's guilt.  An eyewitness and the victim provided contemporaneous and consistent accounts to police officers of how Hernandez aimed and drove his car directly

13

at the victim, who jumped into the bed of a nearby truck to avoid being hit. Hernandez's contradictory claim that he acted in self-defense is fairly weak in comparison, particularly given that the two accounts that Hernandez gave of the incident are inconsistent with each other and also with Maria's version. In his interview with the probation officer, Hernandez was adamant that he never even got into the car. That account conflicts with Maria's, because she told the police that Hernandez got into the car and even started it before security guards beat and pepper-sprayed him.

Moreover, Hernandez did not tell the probation officer that he acted in self-defense, claiming instead that security officers beat and pepper-sprayed him. But in his declaration, Hernandez provided a different account, claiming for the first time to have acted in "self-defense" in a "physical altercation" with security guards. Hernandez does not provide any details of the "altercation" and does not describe exactly what he did in self-defense. But because Hernandez was charged with committing assault with a deadly weapon *with a vehicle*, he presumably claims to have used the vehicle to defend himself. "Self-defense is limited to the use of force that was reasonably necessary to defend against the danger or repel the attack." (*People v. Temple* (2025) 110 Cal.App.5th 1281, 1295.) Under any version of the incident described by Hernandez, Maria, the victim, or the eyewitness, the security guards used physical force against Hernandez by striking him or using batons and pepper spray against him. Driving a car at the victim was an unreasonable amount of force to defend against such an attack.

14

Given the lack of strong community ties, the significant advantages of the plea agreement, Hernandez's contemporaneous assessment of the plea agreement as "fair", the strength of the evidence against him, and the weak evidence of a defense to the charge, we conclude that Hernandez failed to show that he was prejudiced within the meaning of 1473.7 because he failed to demonstrate that there was a reasonable probability that he would have rejected the plea if he "had correctly understood its actual or potential immigration consequences." (*Vivar*, *supra*, 11 Cal.5th 510, 529.) We consequently conclude that it is not reasonably probable that Hernandez would have obtained a more favorable outcome absent the trial court's error. (*Bunas*, *supra*, 79 Cal.App.5th at p. 866.)

II.    *Section 1016.3*

Hernandez contends that the matter should be remanded because the People "failed to recognize their duty imposed on them by section 1016.3, subdivision (b)," by filing a "vigorous and daunting opposition to" Hernandez's motion to vacate. The argument lacks merit.

Section 1016 lists the six different types of pleas that a criminal defendant may enter. Effective 2016, the Legislature codified the obligations set forth by the United States Supreme Court in *Padilla v. Kentucky* (2010) 559 U.S. 356 and related California case law concerning defense counsel's duty "to provide affirmative and competent advice to noncitizen defendants regarding the potential immigration consequences of their criminal cases." (§ 1016.2, subds. (a), (h); Stats. 2015, ch. 705, § 1.) Section 1016.2

15

includes a summary of the legislative findings and declarations with respect to the enactment. Subdivision (a) of section 1016.3 sets forth defense counsel's obligations to advise a defendant about possible immigration consequences. Subdivision (b) of section 1016.3 (§ 1016.3(b)) provides: "The prosecution, in the interests of justice, and in furtherance of the findings and declarations of Section 1016.2, shall consider the avoidance of adverse immigration consequences in the plea negotiation process as one factor in an effort to reach a just resolution."

Section 1016.3(b) does not apply in a postjudgment proceeding involving a defendant's motion to vacate a prior conviction. The plain language of the provision unambiguously makes it applicable only in the context of "the plea negotiation process." (*Ibid.*) We may not disregard that limitation. (*Wilson v. Safeway Stores, Inc.* (1997) 52 Cal.App.4th 267, 272.) Because section 1016.3(b) applies only when the People are negotiating a plea deal, Hernandez's argument that the People's opposition to his postjudgment motion to vacate violated the statute is meritless.

DISPOSITION

The order denying Hernandez's section 1473.7 motion is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ

J.

We concur:

RAMIREZ

P. J.

FIELDS

J.

16